# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# SOUTHEASTERN DIVISION

| | |
|---|---|
| CALLIE RAY GUSTAFSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 1: 20 CV 115 DDN |
| ) | |
| KILOLO KIJAKAZI,[1] ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

This action is before the Court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Callie Ray Gustafson for supplemental security income (SSI) benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1385. The parties have consented to the exercise of plenary authority by a United States Magistrate Judge under 28 U.S.C. § 636(c). For the reasons set forth below, the decision of the Administrative Law Judge is affirmed.

## BACKGROUND

Plaintiff Callie Rae Gustafson was born in 1993. She filed her application on January 10, 2017, alleging a September 17, 2011 disability onset due to fibromyalgia, anxiety, bipolar disorder, Type 2 diabetes, and sequelae from gastrointestinal surgery. (Tr. 165, 196.) On August 6, 2019, following a hearing, the ALJ concluded that plaintiff was not disabled under the Act. (Tr. 18-32.) The Appeals Council denied review. (Tr. 1-6.)

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Kilolo Kijakazi is substituted for Andrew Saul as defendant in this action. No further action is needed for this action to continue. See 42 U.S.C. § 405(g) (last sentence).

Accordingly, the ALJ's decision became the final decision of the Commissioner subject to judicial review by this Court under 42 U.S.C. § 405(g).

## **MEDICAL AND OTHER HISTORY**

The following is plaintiff's medical history relevant to her appeal.

In 2006, plaintiff underwent a partial left knee lateral meniscectomy and arthroplasty of the patella. At that time, she was found to have Grade IV chondromalacia, a softening and deteriorating of the cartilage. (Tr. 1104-05.)

Primary care records from August 2011 through September 2012 show diagnoses of panic disorder without agoraphobia, attention deficit disorder, Type 2 diabetes, fibromyalgia/myositis, dermatitis, depressive disorder, and obesity. (Tr. 947-75.)

An MRI of plaintiff's cervical spine on November 15, 2012, showed straightening of the usual cervical lordosis but was otherwise unremarkable. (Tr. 337.) On November 20, 2012 plaintiff was seen and assessed with neck pain, muscle spasms, and a history of fibromyalgia. (Tr. 324.)

During 2013 plaintiff was seen regularly and diagnosed with Type 2 diabetes, neuropathy, low back pain, panic disorder without agoraphobia, and history of fibromyalgia. Notes indicate that she had severe pain in the morning and suggested that she apply for Medicaid. (Tr. 303-11, 322-23.)

On January 24, 2014, plaintiff weighed 239 pounds and was about 100 pounds overweight. Her assessment was Type 2 diabetes, uncomplicated; neuropathy, pain, low back, and fibromyalgia/myositis, unspecified. On January 28, 2014, a CT scan showed a 3 mm kidney stone. (Tr. 295, 297-98.)

On February 7, 2014, plaintiff was 110 pounds overweight. (Tr. 292.) Her assessment on that date was uncomplicated Type 2 diabetes; unspecified urinary calculi, unspecified fever, and nausea. (Tr. 292-93.)

Neurology records from May 5, 2014, state possible diagnostic considerations are partial complex seizure, vestibular dysfunction, and autonomic impairment. There was also a component that could be caused by anxiety and depression.  (Tr.  340.)

On June 10, 2014, plaintiff weighed 242 pounds and was 112 pounds overweight. Her assessment was panic disorder without agoraphobia; neuropathy; cervical disorder and pain, low back.  She was scheduled for an EEG for seizure activity.  (Tr. 289-90.)

February through October 2014 records from the Kneibert Clinic show impressions of depression, anxiety, kidney stones, obesity, uncontrolled diabetes, fibromyalgia, hyperlipidemia, and weight gain. (Tr. 1275-86, 1302.)  Impressions from August 12, 2014 were psoriasis, anxiety, panic attacks, scoliosis, fibromyalgia, ADHD, rheumatoid arthritis, diabetes mellitus, and acne.  (Tr. 343.)

Urology records from April 2015 show right kidney stones and swelling from fibromyalgia.  (Tr. 991-92.)

Records from St. Francis Medical Center on March 28, 2016 showed pain from kidney stones.  Plaintiff reported she experienced tremors, headaches, nervousness, and numbness.  The assessment was uncontrolled Type 2 diabetes, mixed hyperlipidemia, morbid obesity, vitamin D deficiency, and depression.  A neurological exam from that date was unremarkable and specifically documented no hand tremors.  (Tr. 1508-11.)  Her hemoglobin A1C was 6.1%, which falls within the upper end of the expected range.  (Tr. 362.)  Lab results showed a fatty liver.  (Tr. 371.)

On September 14, 2016, a pre-operative psychological diagnostic interview stated plaintiff was a reliable historian of average intelligence.  Her attention and concentration were generally intact and there was no evidence of a thought disorder.  Her learning was grossly intact, but she demonstrated problems with long-term memory and recalling remote life events.  She had fair insight into her conditions.  Her mood was euthymic or normal with congruent affect.  She had no dramatized pain behaviors. Psychological testing showed mild somatic symptom severity, severe anxiety, and severe depression.  (Tr. 1310-11.)

Lab reports from November and December 2016 showed high blood glucose.  She was diagnosed with uncontrolled Type 2 diabetes with diabetic neuropathy.  (Tr. 398, 408, 896.)  On November 17, 2016, plaintiff underwent sleeve gastrectomy, a laparoscopic surgical weight loss procedure, at St. Francis Medical Center (St. Francis).  (Tr. 374-485.)

On November 25, 2016, she reported to St. Francis with abdominal pain. The next day she underwent a small bowel resection for an ischemic bowel.  (Tr. 491, 555-56.)  She underwent another small bowel resection on November 28, 2016.  (Tr. 576, 590.)  She had a vacuum assisted closure (VAC) system in place on December 27, 2016.  It was functioning well, and her wound was healing.  She most likely had mesenteric thrombosis (blood clot in one of the major veins draining blood from the intestines) resulting in jejunal ischemia (reduced blood flow) and necrosis.   She was discharged December 9, 2016.  (Tr. 493-94.)

On January 5, 2017 plaintiff experienced problems with the gastric sleeve. Examination showed plaintiff was alert and oriented, had no tenderness or swelling in the extremities, a soft and non-tender abdomen with a healing wound, full muscle strength, and no sensory deficits.   (Tr. 511-12.)

On January 12, 2017, she was treated for abdominal pain by her primary physician. Examination revealed plaintiff was healthy appearing, in moderate distress, was ambulating normally, had unremarkable heart and lungs, and the healing abdominal incision showed no signs of infection.   (Tr. 769-73.)  She was treated again for abdominal pain on January 30, 2017.  (Tr. 778.)

On February 14, 2017, plaintiff was seen in the emergency room for abdominal pain and  bloody  stools.   Examination  revealed  she  was  in  no  distress,  well-developed  and nourished, had normal range of motion in her neck, a normal heart and lungs, a soft abdomen with generalized tenderness and normal bowel sounds, and normal musculoskeletal range of motion and reflexes.  A CT scan of the abdomen showed previous gastric bypass surgery, diffuse fatty changes of the liver, resolution of free fluid in the abdomen found on previous study, and no significant pathology.  She was discharged home the same day. (Tr. 495-500.)

On February 20, 2017, plaintiff was treated for blood in her stool.  She was healthy appearing, well nourished, well developed, and in no apparent distress.  Plaintiff was ambulating normally, had full range of motion of the neck, unremarkable normal heart and lungs, normal bowel sounds, no abdominal tenderness or masses, full motor strength and muscle tone, normal joints, no edema, a normal gait and station, intact nerves and sensation, and normal curvature of the spine.  Psychiatric examination showed good insight and judgment, a normal mood and affect, and normal recent and remote memory.  She was diagnosed with generalized anxiety disorder, anticoagulant therapy, stool flecked with blood, vitamin B deficiency, insomnia, endocrine/metabolic screening.  (Tr. 779-83.)

On February 28, 2017, at a three-month postoperative visit, plaintiff reported she was not doing any physical activity and had recently been seen in the emergency room for abdominal pain and bloody stools, but that her lab and diagnostic tests were normal.  Examination showed a well-healed scar.  She was instructed to be more physically active and to use the fitness membership she had been provided.  (Tr. 1371-73.)

From January 2017 through July 2018, examinations performed by plaintiff's primary care providers at Missouri Highlands Health Care documented plaintiff as healthy appearing.  She ambulated normally, had an unremarkable heart and lungs, a normal gait, a soft abdomen with normal bowel sounds, normal muscle tone and strength, and normal movement of the extremities. (Tr. 1001, 1005-06, 1015, 1020, 1025, 1029, 1033-34, 1038, 1042, 1047, 1051, 1058, 1063, 1068, 1073, 1078, 1083, 1088.)

Plaintiff was hospitalized from March 13-15, 2017 for suicidal and homicidal ideations, but without plans.  She was diagnosed with bipolar disorder.  Upon discharge, she was fully oriented with an appropriate mood, was calm and cooperative, had a soft and non-tender abdomen, steady gait, strong handgrip, and full leg strength.  (Tr. 813-19.)

From March 29, 2017 through August 30, 2018, plaintiff received psychological treatment from Bootheel Counseling (Bootheel) for anxiety, paranoia, and depression.  At one point she described seeing shadowy figures in her room.  She was diagnosed with Bipolar II Disorder.  She frequently felt tired and weak.  Mental status exams were generally

normal, except for suicidal and homicidal ideas, judgment, and poor insight.  In October 2017 she stated it was hard for her to make appointments because she felt anxious when she left the house.  Notes from Bootheel on July 27, 2018, state she was not compliant with depression medication because it made her tired and she thought it was causing seizures. (Tr. 844-56, 1182, 1189, 1201-08, 1230, 1245-46.)

On June 24, 2017, plaintiff was seen in the emergency room for blood in her urine. A CT showed multiple kidney stones.  She had normal behavior, ambulated independently, and was able to perform all activities of daily living without assistance.  On examination, notes state she was well nourished and in no apparent distress.  She had an unremarkable heart and lungs; her abdomen was soft, flat, and non-tender with normal bowel sounds; and she had normal joint range of motion without swelling or deformities.  She was discharged home the same day.  (Tr. 1347-48, 1352.)

On September 19, 2017, records from St. Francis Medical Center showed that she complained of blood in her stool and chronic abdominal discomfort that was limiting her activity.  The doctor was concerned about her weight gain so soon after surgery.  The diagnosis was obesity (class II or moderate risk), generalized abdominal pain, and weight gain.  (Tr. 1380-82.)

Records from October 2, 2017, showed blood in plaintiff's stool.  She denied abdominal pain.  Examination revealed tenderness in the epigastric area, but an otherwise normal physical examination.  (Tr. 1417, 1420-21.)

March 21, 2017, records from St. Francis Medical Center showed blood in plaintiff's stool and that she was agitated and tearful.  Her doctor suspected noncompliance with her recommended treatment plan.  Examination revealed plaintiff was fully oriented, well-developed and nourished, had a normal heart and lungs, a soft abdomen with normal bowel sounds and generalized abdominal tenderness, and normal musculoskeletal range of motion. (Tr. 1382, 1399, 1455.)

On March 9, 2018, plaintiff began seeing Victor Lawrinenko, M.D., a gastrologist, for complaints of abdominal pain since her gastric sleeve surgery in 2016.  Examination

revealed plaintiff was well-developed, well-nourished, and in no apparent distress. She had abdominal tenderness, but normal bowel sounds; no masses; good muscle mass, tone, and strength; and full range of motion. She had normal coordination and reflexes. Dr. Lawrinenko's impression was chronic midepigastric abdominal pain due to complications from gastric sleeve surgery. (Tr. 1123-26.)

On March 27, 2018, records show gastrointestinal hemorrhage associated with a peptic ulcer. Examination that day showed she was well nourished, in no distress, had normal range of motion, a soft and non-tender abdomen, and normal mental status. (Tr. 1427, 1444-45.)

September 27, 2018, records from Bootheel Counseling showed fair attention and concentration, but also revealed tremors. Her primary diagnosis was major depressive disorder- moderate. Her mental status exam was normal except for poor judgment and insight. (Tr. 1578-80.)

On November 13, 2018, a gastroenteric examination revealed some abdominal tenderness but was otherwise unremarkable. She had normal heart and lungs; a non-distended abdomen with normal bowel sounds; good muscle mass, tone, and strength with full range of motion all extremities; normal coordination; and normal reflexes. An endoscopy and colonoscopy performed a few days later showed some changes, but biopsies were benign. (Tr. 1550-56.)

On January 7, 2019, records from Bootheel showed fair attention, fair concentration, and normal neurological function without tremors. The diagnosis was major depressive disorder – moderate. Mental status exam was normal except for fair judgment and insight. (Tr. 1585-87.)

March 4, 2019 records from Bootheel showed a primary diagnosis of bipolar II disorder. Plaintiff reported PTSD, night terrors every night, daily panic attacks, as well as social anxiety. Mental status exam was normal except for fair eye contact, judgment, and insight. (Tr. 1590-93.)

A September 9, 2019 MRI of plaintiff's lumbar spine dated showed L5 sacralized, hypoplastic (short) ribs at T12, small L4-L5 disc protrusion with no significant central canal stenosis or narrowing, minimal left L3-L4 and left L-4 L5 foraminal stenosis, and minor midlumbar levoscoliosis or spinal curvature to the left.

**ALJ Hearing**

On April 2, 2019, plaintiff appeared and testified to the following at a hearing before an ALJ.  (Tr. 1598-1639.)  She is 25 years old, 5'3" tall, and weighs 253 pounds.  She graduated from high school but took longer to graduate than normal because she was sick all the time.  She had a lot of problems with panic attacks and bipolarism.  She did not get along with many kids growing up and her teachers bullied her.  She just had a lot of problems and nobody would help her.

She experiences a lot of major depression, bipolar, and PTSD, and gets sensory overload sometimes.  (Tr. 1605-06.)   Sensory overload occurs when she is in a large area or a crowded room with a lot of noise, her ears start to ring, and then she "freaks out," like a major panic attack.  This happens most when she goes shopping or to Walmart.  (Tr. 1605-07.)

She cannot get out of bed to do anything because of her depression.  Her depression stems from her physical pain.  Everyday life is pretty hard; she hurts all the time due to her bowel situation, back, scoliosis, arthritis, and fibromyalgia, compounding her depression.  Medication has improved her depression, but it varies, and is not a cure all.  (Tr. 1607.)

Her PTSD usually occurs during the night.  She has sleep paralysis, and usually she will wake up or think that she's awake.  She had open bowel and wound VAC.  She also has "visions" that affect her ability to sleep at night, requiring her to nap during the day.  (Tr. 1607-08.)

She does not sleep well because she cannot lay straight on her back due to scoliosis.  She cannot sleep on either of her sides because she has an infection in her bowels, as well as as swollen lymph nodes on her bowel, and two embedded kidney stones.  (Tr. 1608-09.)

She usually experiences panic attacks when out in public. She gets very nervous, paranoid, and starts to sweat excessively. She gets nauseous very easily. She "freaks out" and needs to retreat to the bathroom for about 20 minutes to be alone. She is still secreting blood in her stool from blood clots. She sometimes throws up or gets an upset stomach if the panic attacks last more than an hour. (Tr. 1609-10.)

In 2016 she had sleeve gastrectomy. The day after the surgery she experienced major pain that she does not even remember. She was hospitalized for a blood clot in her lower bowel and was placed in a coma for three and a half weeks. She then had an open wound VAC, a type of therapy to help wounds heal, and as a result, she cannot lift anything or even take her dogs out for a brief walk. (Tr. 1610-11.).

She was born with scoliosis which makes it difficult to lift anything. She thinks her scoliosis is getting worse with age. She has fibromyalgia and sees a doctor for it. It affects her every day, including in her neck, legs, and feet. (Tr. 1612-13.)

She underwent left knee surgery when she was twelve years old and then tore her ACL about a year later. She thinks she should probably use a cane because it hurts to walk and neither of her legs are in very good shape. (Tr. 1614.)

Her bipolar disorder prevents her from working. Sometimes it's hard to talk to people because she doesn't know what to say and they make her mad. She takes Valium before a doctor's appointment to avoid a panic attack or a PTSD moment. She sees Dr. Carlyle at Bootheel Counseling Services for her bipolar disorder. (Tr. 1615.)

When she was 16 years old, she attempted to work at a nursing home but was let go after one day. She couldn't do the job because her feet swelled up. Her feet continue to swell if she walks a lot, such as when she walks around Walmart for two hours. She needs to use a cart for support if she walks around Walmart. (Tr. 1616-17.)

She can sit at a desk for about 20 minutes without having to get up, lie down, and straighten her back for about 30 minutes. She paints as a hobby. She can draw while seated for about 20 minutes before needing to lie down. She cannot sit down for several hours to complete a project. (Tr. 1618-21.)

She can stand for about five minutes and walk about a quarter of a mile without pain in her back and knees.  She cannot lift more than ten pounds.  Her hands shake and were shaking during the hearing. She cannot exercise because of pain in her hips, knees, and back.  She cannot vacuum.  She cannot sit for an hour in church because her legs fall asleep.  She cannot get down on her hands and knees to look for something under furniture.  Her knees crack when she bends or moves them, and she cannot squat.  She can clean dishes intermittently.  She can fold laundry although her arms fall asleep.  (Tr. 1621-26.)

Vocational Expert (VE) Robin Cook also testified at the hearing.  The ALJ asked the VE to assume a hypothetical individual of plaintiff's age and education, with a full range of light work with some mental limitations.  The individual would be limited to performing simple routine tasks and could work at a consistent pace throughout the workday, but not at a production rate pace where each task must be completed within a strict time deadline. The individual would be limited to work that requires only occasional changes in the work setting and could have occasional interaction with co-workers and the public.  The VE testified that the individual could perform jobs such as photo machine operator and housekeeper, cleaner. (Tr. 1628-34.)

The ALJ asked a second hypothetical question with the same limitations but also limiting the individual to sedentary work.  The VE answered that there was no work available under that scenario.  The ALJ then asked if the individual was off task for twenty percent of the time if work would be available, to which the VE answered that there would be no work available.  Finally, the ALJ asked the VE whether work would be precluded if the individual had to lie down either once or twice a day for 30 minutes, to which she answered yes.  (Tr. 1635-37.)

## **GENERAL LEGAL PRINCIPLES**

The Court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. *Pate-Fires v. Astrue,* 564 F.3d

935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Id.* In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. *Id.* As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. *See Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability insurance benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 1382c(a)(3)(A); *Pate-Fires*, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. § 404.1520(a)(4); *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987) (describing five-step process); *Pate-Fires*, 564 F.3d at 942 (describing five-step process).

Steps One through Three require the claimant to prove: (1) she is not currently engaged in substantial gainful activity; (2) she suffers from a severe impairment; and (3) her condition meets or equals a listed impairment. 20 C.F.R. § 416.920(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant retains the residual functional capacity (RFC) to perform past relevant work (PRW). *Id.* § 416.920(a)(4)(iv). The plaintiff bears the burden of demonstrating she is no longer able to return to her PRW. *Pate-Fires*, 564 F.3d at 942. If the Commissioner determines the plaintiff cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 416.920(a)(4)(v).

## DECISION OF ALJ

On August 6, 2019, the ALJ issued a decision finding that plaintiff was not disabled under the Act. (Tr. 18-32.) At Step One, the ALJ found plaintiff had not engaged in substantial gainful activity since her application date of January 10, 2017. At Step Two, the ALJ found plaintiff had severe impairments of status-post laparoscopic sleeve gastrectomy with mesenteric venous thrombosis and subsequent bowel resection; erosive esophagitis; mental health conditions variably diagnosed as bipolar disorder and major depressive disorder; and obesity. (Tr. 23.) The ALJ found diabetes mellitus, gastroesophageal reflux disease, and insomnia were non-severe impairments. Plaintiff's fibromyalgia and PTSD were not medically determinable impairments. (Tr. 23-24.) At Step Three, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled an impairment listed in the Commissioner's list of presumptively disabling impairments, 20 CFR Part 404, Subpart P, Appendix 1.

The ALJ concluded plaintiff retained the RFC to perform "light" work as defined in 20 CFR 416.967(b), except she was limited to performing simple, routine, or repetitive tasks, but not in a fast-paced environment such as an assembly line. She was limited to work that requires only occasional changes in the work setting and occasional interaction with coworkers and the public. (Tr. 26.) At Step Four, the ALJ found plaintiff did not have any past relevant work. (Tr. 30.) Based on the RFC and testimony from a vocational expert, at Step Five, the ALJ found plaintiff could perform other work that existed in significant numbers in the national economy, including a photocopy machine operator and housekeeping cleaner. Accordingly, the ALJ found plaintiff was not disabled. (Tr. 31.)

## DISCUSSION

Plaintiff argues the ALJ failed to fully and fairly develop the record in not requiring a consultative exam. She also argues substantial evidence shows that she does not meet the requirements of light work and that the ALJ's failure to properly evaluate her RFC changed the outcome of the case.

Residual functional capacity is a function-by-function assessment of an individual's ability to do work-related activities based on all the evidence. *Casey v. Astrue*, 503 F.3d 687, 696 (8th Cir. 2007). The claimant has the burden to establish her RFC. *Mabry v. Colvin,* 815 F.3d 386, 390 (8th Cir. 2016). The ALJ retains the responsibility of determining a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians, examining physicians, and others, as well as the claimant's own descriptions of her limitations. *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001). Ultimately, RFC is a medical question, which must be supported by medical evidence contained in the record. *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001). The RFC need only include the limitations supported by the record. *Tindell v. Barnhart*, 444 F.3d 1002, 1007 (8th Cir. 2006). There is no requirement that an RFC finding be supported by a specific medical opinion. *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) (citing *Myers*, 721 F.3d at 526-27) (affirming RFC without medical opinion evidence); *Perks v. Astrue*, 687 F.3d 1086, 1092-93 (8th Cir. 2012) (same)).

The ALJ found that the claimant had the RFC to perform "light" work as defined in 20 CFR 404.1567(b), with two exceptions. First, she was limited to performing simple, routine or repetitive tasks but not is a fast-paced environment such as an assembly line. Second, she was further limited to work that required only occasional changes in the work setting and only occasional interaction with co-workers and the public. (Tr. 26.)

In support of her argument, plaintiff refers to her own testimony that she cannot lift more than 10 pounds, can stand only five minutes without knee and back pain, can walk only for about a quarter of a mile without pain in her back and knees, cannot get on her hands and knees to look for something, and cannot squat or exercise. She argues that, if supported by the medical evidence, these limitations would preclude light work. She also claims the ALJ neglected to discuss her knee condition, which may have changed the decision. The Court disagrees.

The Court concludes the ALJ's RFC finding is supported by substantial evidence. As the ALJ discussed, plaintiff underwent bariatric surgery a few months prior to the

relevant time period. Plaintiff experienced subsequent complications of infection and clotting that required additional surgery and eventual wound closure in December 2016, just prior to the beginning of the relevant period. (Tr. 493-94, 647-52, 663.) Follow-up examinations in early 2017 were unremarkable, and noted plaintiff appeared healthy and well-nourished, was ambulating normally, had full range of motion of her extremities, possessed normal motor strength and muscle tone, no joint abnormalities, normal curvature of the spine, intact sensation, normal bowel sounds, no abdominal masses, and a soft abdomen with some generalized tenderness. (Tr. 497, 772, 777, 782-83, 1373, 1399.) A CT scan of her abdomen did not show any significant pathology. (Tr. 499-500.) In February 2017, at her three-month postoperative follow-up, plaintiff's gastroenterologist reminded her to be more physically active and to "take advantage" of the free gym membership she had been provided. (Tr. 1373.)

Despite plaintiff's complaints of pain, fatigue, and diarrhea, physical examinations throughout the relevant period remained largely unremarkable, with mostly normal or mild findings. Examinations by multiple providers consistently revealed plaintiff was in mild or no distress, was well-appearing, had a non-tender abdomen with normal bowel sounds, exhibited full range of motion and strength throughout her musculoskeletal system, had intact motor coordination and reflexes, as well as a normal gait and station. (Tr. 497, 1001, 1005-06, 1015, 1020, 1025, 1029, 1033-34, 1037, 1068, 1078, 1083, 1088, 1125, 1345, 1347, 1496-97, 1550.) Diagnostic and laboratory studies showed some inflammation in her esophagus and benign colon polyps, but pathology reports of the gastrointestinal system were otherwise normal. (Tr. 924-28, 1446, 1552, 1554-56.) An MRI of plaintiff's spine revealed only minimal narrowing of the spine, a small disc protrusion at L4-5 without any narrowing of the spine at that level, and minor scoliosis at L4-5. (Tr. 16-17.)

As the ALJ discussed, these consistently benign clinical findings failed to demonstrate plaintiff had any limitations in her ability to sit, stand, or walk, and thus support a limitation for the full range of light work. (Tr. 28). *See Steed v. Astrue,* 524 F.3d 872, 876 (8th Cir. 2008) (upholding ALJ's finding that plaintiff could perform light work based

on largely mild or normal objective findings regarding her back condition, despite the fact that the medical evidence was silent regarding work-related restrictions such as the length of time she could sit, stand, and walk and the amount of weight she can carry.).

As for plaintiff's assertion that the RFC for light work is not supported by substantial evidence based on her own testimony that she was incapable of lifting more than ten pounds and and could not stand or walk for more than several minutes without significant back and knee pain, plaintiff's testimony about certain limitations does not mean the ALJ must include them in the RFC finding. Agency regulations state that an individual's symptoms alone cannot be used to establish disability. 20 C.F.R. § 416.929(a). The ALJ must consider "the extent to which there are any conflicts between your statements and the rest of the evidence." 20 C.F.R. § 416.929(c)(4).

The ALJ considered plaintiff's allegations of pain, fatigue, and nausea from her alleged physical impairments, as well as her statements that these impairments limited her ability to sit, stand, walk, and perform postural maneuvers. (Tr. 27-28.) However, as noted by the ALJ and discussed above, plaintiff's allegations are not entirely consistent with the evidence as a whole. (Tr. 27-28.) The ALJ acknowledged plaintiff's testimony about experiencing some pain and other symptoms, but the question is whether the symptoms were so severe as to be disabling. (Tr. 28.) *See Baker v. Apfel*, 159 F.3d 1140, 1145 (8th Cir. 1998) (Based on all the medical evidence, there is no doubt that the claimant experiences pain; the question is whether the pain, in and of itself, is so severe as to be disabling.). It is true that symptoms cannot always be measured objectively, but medical evidence is useful in making reasonable conclusions about an individual's ability to perform work-related activities. "[W]e must consider whether an individual's statements about the intensity, persistence, and limiting effects of his or her symptoms are consistent with the medical signs and laboratory findings of record." SSR 16-3p, 2017 WL 5180304, at *2. As explained by the ALJ, the evidence in this case does not support the degree of pain and limitations alleged by plaintiff.

Plaintiff contends her history of a knee impairment during 2005-2006 supports her testimony that she could not perform the standing and walking requirements of light work, and that it was an error for the ALJ not to consider this. The Court disagrees. The relevant period at issue here is from January 10, 2017, plaintiff's application date, through August 6, 2019, the date of the ALJ's decision. Plaintiff underwent treatment for her knee more than ten years before the relevant period. The evidence fails to document any further treatment related to plaintiff's knees during the relevant period. Further, plaintiff's failure to seek treatment for her allegedly disabling knee pain is inconsistent with her statements. *See Milam v. Colvin*, 794 F.3d 978, 985 (8th Cir. 2015). As noted by the ALJ, the objective record consistently documented unremarkable physical examinations, including a normal gait and station, full muscle strength, and normal range of motion. (Tr. 497, 772, 777, 782-83, 1001, 1005-06, 1015, 1020, 1025, 1029, 1033-34, 1037, 1068, 1078, 1083, 1088, 1125, 1345, 1347, 1373, 1399, 1496-97, 1550.) The record evidence provides adequate information of plaintiff's ability to function, allowing the ALJ to render a decision about disability. *See generally* 20 C.F.R. §§ 416.920b, 416.945.

Plaintiff next alleges that the ALJ's physical RFC finding is not supported by substantial evidence because the record lacks evidence about her ability to meet the requirements of light work, and the ALJ failed to fully develop the record on this issue. Specifically, plaintiff contends she receives treatment for longstanding myalgia, which could cause an inability to stand or walk for six hours in a day. Thus, the ALJ should have developed the record further by ordering a consultative examination instead of finding fibromyalgia was not a medically determinable impairment. Pl. Br. at 7-8. Plaintiff is incorrect. The Eighth Circuit has held that because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace; however, there is no requirement that an RFC finding be based on a specific medical opinion. *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) (citations omitted).

At Step Two, the ALJ acknowledged plaintiff's allegation of fibromyalgia as a disabling impairment but noted that the record evidence lacked the required clinical and/or laboratory findings necessary to establish fibromyalgia as a medically determinable impairment.  (Tr. 23.)  For an impairment to be severe, it must first be medically determinable.  *See* 20 C.F.R. §§ 416.921, 416.922.  Medically determinable impairments "must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques" and "must be established by objective medical evidence from an acceptable medical source."  20 C.F.R. § 416.921 (emphasis added).  Additionally, "[w]e will not use [a claimaint's] statement of symptoms, a diagnosis, or a medical opinion to establish the existence of an impairment(s)." *Id.* (emphasis added).

Here, although the record contains a diagnosis of fibromyalgia (Tr. 1063, 1068, 1083, 1088), it does not contain evidence of the diagnostic criteria required by the American College of Rheumatology to properly establish a diagnosis of fibromyalgia, as set forth in SSR 12-2p, 2012 WL 3104869.  Specifically, the record evidence does not document a history of widespread pain in all four quadrants of the body, at least eleven of the required positive tender points on physical examination, repeated manifestations of six or more symptoms or signs of fibromyalgia, along with evidence that other disorders that could have caused the symptoms or signs have been excluded.  *Id.*  And although plaintiff may have been diagnosed with fibromyalgia, this alone is not sufficient to establish it as a medically determinable impairment (20 C.F.R. § 416.921).  As previously discussed, the ALJ considered medical evidence spanning the relevant period that consistently documented largely normal or mild clinical findings inconsistent with plaintiff's allegations of debilitating limitations related to fibromyalgia.  (Tr. 497, 772, 777, 782-83, 1001, 1005-06, 1015, 1020, 1025, 1029, 1033-34, 1037, 1068, 1078, 1083, 1088, 1125, 1345, 1347, 1373, 1399, 1496-97, 1550.)

Despite the fact that the record evidence does not establish plaintiff's fibromyalgia as a medically determinable impairment, and that it is her burden to establish the impairment

by providing the necessary evidence, plaintiff alleges the ALJ failed to fully develop the record by ordering specific testing to establish that her alleged fibromyalgia meets the diagnostic criteria, and that she is unable to meet the standing and walking requirements for light work.

The Court disagrees. An ALJ has a duty to ensure the record is fully developed. 20 C.F.R. §§ 416.913, 416.920. Just because the evidence does not say what is desired, does not mean the ALJ failed to develop the record. *See Shannon v. Chater*, 54 F.3d 484, 488 (8th Cir. 1995) (Reversal due to failure to develop the record is warranted only where such failure is unfair or prejudicial.).

In support of her position concerning a consultative examination, plaintiff cites *Boyd v. Sullivan*, 960 F.2d 733 (8th Cir. 1992), and *Noerper v. Saul*, 964 F.3d 738 (8th Cir. 2020). However, unlike the facts in *Boyd* and *Noerper,* the medical record evidence here remains consistent throughout the relevant period and repeatedly documents normal or mild physical findings.   (Tr. 497, 772, 777, 782-83, 1001, 1005-06, 1015, 1020, 1025, 1029, 1033-34, 1037, 1068, 1078, 1083, 1088, 1125, 1345, 1347, 1373, 1399, 1496-97, 1550). Further, in both *Boyd* and *Sullivan*, the record evidence showed that the claimants received regular treatment for the alleged conditions during the relevant periods, and records of that treatment either conflicted with one another or were missing from the record entirely. Such is not the case here.

Here, no evidence suggests that relevant medical records are outstanding. Plaintiff has been represented by the same counsel since 2017. At the hearing, the ALJ left the record open for 30 days to allow plaintiff's attorney an additional opportunity to obtain any outstanding records, even after a provider indicated it had no additional records for plaintiff. (Tr. 65-66, 1604.) Nor does the record contain ambiguities or conflicting information. A difference exists between an inadequate record and one that just does not support the allegations. "At the very least, the claimant's failure to provide medical evidence with this information should not be held against the ALJ when there *is* medical evidence that supports

the ALJ's decision." *Steed*, 524 F.3d. at 876 (ALJ is not required to seek additional clarifying medical evidence unless a crucial issue is undeveloped).

In sum, the burden is on the claimant to establish the limitations contained in the RFC. *See Buford v. Colvin*, 824 F.3d 793, 796 (8th Cir. 2016). All of the relevant, consistent evidence together formed substantial medical evidence to support the RFC for light work. *See Julin v. Colvin*, 826 F.3d 1082, 1089 (8th Cir. 2016). The ALJ's RFC finding is supported by the evidence of record as a whole, and was within the ALJ's zone of choice. *See Twyford v. Comm'r, Soc. Sec. Admin.*, 929 F.3d 512, 518 (8th Cir. 2019) (citations omitted). Although plaintiff may believe the evidence indicates greater limitations than found by the ALJ, the mere fact that some evidence may support a conclusion opposite of that reached by the Commissioner, does not allow this Court to reverse the ALJ's decision. *Swink v. Saul*, 931 F.3d 765, 770 (8th Cir. 2019). Substantial evidence is a lower standard than preponderance of the evidence, and great deference is given to the ALJ's decision. *Crawford v. Colvin*, 809 F.3d 404, 407-08 (8th Cir. 2015).

## CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed. An appropriate Judgment Order is issued herewith.

S/   David D. Noce<br>**UNITED STATES MAGISTRATE JUDGE**

Signed on December 1, 2021.